Appeal No. 22-2433

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

CATHERINE ERDMAN,
*Plaintiff – Appellant*

v.

CITY OF MADISON,
*Defendant – Appellee*

On Appeal from the United States District Court
for the Western District of Wisconsin
Case No. 3:16-cv-00786-wmc
The Honorable Judge William M. Conley, Presiding

**RESPONSE BRIEF OF DEFENDANT-APPELLEE CITY OF MADISON**

Kathryn A. Harrell
Storm B. Larson
BOARDMAN & CLARK LLP
One South Pinckney Street,
Suite 410
Madison, Wisconsin  53701-0927
(608) 257-9521
kharrell@boardmanclark.com
slarson@boardmanclark.com

*Attorneys for Defendant-Appellee
City of Madison*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. Civ. App. P. 26.1 and Circuit Rule 26.1, Defendant-Appellee City of Madison provides the following information:

(1)     The full name of every party that the attorney represents in this case:

City of Madison

(2)     If the parties are corporations: (i) the identity of any parent corporation and (ii) any publicly held corporation owning 10% of more of its stock:

The City of Madison is not a corporation.

(3)     The names of all law firms whose partners or associates have appeared for the parties in the case or are expected to appear for the parties in court:

Boardman & Clark LLP
1 South Pinckney Street, Suite 410
P.O. Box 927
Madison, Wisconsin  53701-0927
(608) 257-9521

/s/ *Kathryn A. Harrell*
Kathryn A. Harrell*

_____

* *Counsel of Record* for the above-listed parties pursuant to Circuit Rule 3(d).

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. Civ. App. P. 26.1 and Circuit Rule 26.1, Defendant-Appellee City of Madison provides the following information:

(1) The full name of every party that the attorney represents in this case:

  City of Madison

(2) If the parties are corporations: (i) the identity of any parent corporation and (ii) any publicly held corporation owning 10% of more of its stock:

  The City of Madison is not a corporation.

(3) The names of all law firms whose partners or associates have appeared for the parties in the case or are expected to appear for the parties in court:

  Boardman & Clark LLP
  1 South Pinckney Street, Suite 410
  P.O. Box 927
  Madison, Wisconsin  53701-0927
  (608) 257-9521

        */s/ Storm B. Larson*
        Storm B. Larson

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENTS ........................................ i

TABLE OF AUTHORITIES ......................................................v

JURISDICTIONAL STATEMENT ................................................1

STATEMENT OF THE ISSUES ...............................................1

STATEMENT OF THE CASE ..................................................1

   I.    Introduction....................................................1

   II.   Standard of Facts................................................2

        A. The 2014 Recruitment ........................................2

        B. Background and Validation of the Department's PAT .........4

           i.  Test Formation................................................5

           ii. Scoring .......................................................7

           iii. Revalidation .................................................9

           iv. The Pike Pole Component ............................. 16

           v.  The Ladder Component ................................. 17

        C. Ms. Erdman's Performance on the PAT ............................ 18

        D. The Candidate Physical Ability Test ("CPAT").................. 19

        E. Ms. Erdman's Applications to the Department  ............... 21

        F. The Present Litigation....................................... 21

SUMMARY OF ARGUMENT ................................................ 23

STANDARD OF REVIEW ....................................................... 24

ARGUMENT ........................................................................

    I.  The District Court Erred in Denying Summary Judgment to
       the City Because Ms. Erdman Failed to Make a Prima Facie
       Case of Discrimination ............................................. 25

    II.  The District Court Correctly Concluded That Ms. Erdman
       Failed To Meet Her Third-Stage Burden of Proof That
       the CPAT Would Have Serviced the Department's
       Legitimate Needs ...................................................... 32

       A. Transferability Study ............................................. 34

       B. Predictor of Success ............................................... 34

       C. High Percentage of Women Firefighters Under the PAT ....... 35

       D. Specific Aspects of the PAT ..................................... 35

       E. Exact Replication .................................................. 36

    III.  The District Court Correctly Held That Ms. Erdman Was
       Not Entitled to Lost Wages Because It Was Not
       "Reasonably Clear" That She Would Have Been Offered
       the Position.............................................................. 37

CONCLUSION...................................................................... 40

CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P.
32(a)(7) ............................................................................ 42

CERTIFICATE OF SERVICE................................................ 43

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Anderson v. City of Bessemer City, N.C.*,
   470 U.S. 564 (1985) .................................................................................. 24

*Davis v. Cintas Corp.*, 717 F.3d 476, 495 (6th Cir. 2013) .......................... 30, 31

*Easterling v. State of Connecticut*,
   783 F. Supp. 2d 323 (D. Conn. 2011) ........................................ 26, 28, 29, 30

*Ernst v. City of Chicago*,
   837 F.3d 788,at  (7th Cir. 2016) ................................................................ 33

*Evans v. City of Evanston*, 881 F.2d 382, 385-86 (7th Cir. 1989) .................. 38

*Furnco Constr. Corp. v. Waters*,
   438 U.S. 567 (1978) .................................................................................. 33

*G. M. Enterprises, Inc. v. Town of St. Joseph, Wis.*,
   350 F.3d 631 (7th Cir. 2003) .................................................................... 24

*Malachinski v. Comm'r*,
   268 F.3d 497 (7th Cir. 2001) ............................................................... 33, 37

*Watson v. Fort Worth Bank & Tr.*,
   *st*, 487 U.S. 977 (1988) ....................................................................... 25, 33

**Statutes**

42 U.S.C. § 2000e-2(k)(1)(B)(i) ....................................................... 25, 27, 30, 31

**Rules**

Fed. R. Civ. P. 52(a)(6) ...................................................................................... 24

**Regulations**

29 C.F.R. § 1607 UNIFORM GUIDELINES ON EMPLOYEE SELECTION
   PROCEDURES (1978)....................................................................6, 9, 10, 15, 37

29 C.F.R. § 1607.4(D) ....................................................................................... 32

29 C.F.R. § 1607.14(C)(1) ................................................................ 37

29 C.F.R. § 1607.5(F) ..................................................................... 37

## JURISDICTIONAL STATEMENT

The Jurisdictional Statement that Plaintiff-Appellant Catherine Erdman ("Ms. Erdman") filed on March 16, 2023 is complete and correct.

## STATEMENT OF THE ISSUES

1.     Did the district court error in denying the City of Madison's ("City") motion for summary judgment on the grounds that Ms. Erdman failed to make a prima facie case of discrimination?

2.     Did the district court correctly conclude that Ms. Erdman failed to meet her third-stage burden of proof that the CPAT would have served the City Fire Department's ("Department") legitimate needs?

3.     Did the district court correctly hold that Ms. Erdman was not entitled to lost wages because it was not "reasonably clear" that she would have been offered the position?

## STATEMENT OF THE CASE

### I.     Introduction

Ms. Erdman was an applicant for employment in the Department. She brings this action against the City alleging that the City discriminated against her on the basis of gender. In particular, Ms. Erdman alleges the City violated Title VII of the Civil Rights Act of 1964, as amended, § 2000e, et seq., by denying her employment as a firefighter because she failed a physical test that had a disparate impact on females and was not a business necessity.

1

## II.     Statement of Facts

The City operates the Department, which employs approximately 365 firefighters. (Dkt. #53, ¶3.) It annually engages in a recruitment process to fill vacancies. (Dkt. #53, ¶3.) The Department is dedicated to ensuring diversity and actively works to attract qualified women and minorities. (Tr. Dkt. #67, 128:3-9.)  Indeed, while nationwide, women comprise about 4% of firefighters, they comprised 10.8% of the Department in 2018, a percentage that was even higher in 2014. (Tr. Dkt. #67, 155:13-21.)

### A. The 2014 Recruitment

In the job bulletin for the Department's 2014 recruitment for firefighters, the physical requirements of the position were identified as follows:

> While not an exclusive list, the following examples are meant to illustrate some of the extreme physical demands and working conditions inherent in the role of a firefighter.
>
> Physical Demands
>
> 1.     Pick up and advance charged fire hoses.*
> 2.     Force entry with axe/battering ram.*
> 3.     Rescue/extricate victim(s).*
> 4.     Perform CPR; apply bandages.
> 5.     Climb stairs carrying heavy equipment, while wearing firefighter protective clothing that weighs in excess of 50 pounds.*
> 6.     Strip and vent roofs, breach walls, overhaul burned buildings.*
> 7.     Lift and climb/descend ladders (with victims).*

8.     Visually determine fire status/hazards; assess patient conditions.
9.     Hear calls for help; identify fire noise, etc.
10.    Walk on roof tops under adverse conditions.
11.    Operate power tools and extrication equipment; tie knots.
12.    Stoop, crawl, crouch, and kneel in confined spaces.*
13.    Reach, twist, balance, grapple, bend and lift under emergency conditions.*
14.    Run, dodge, jump and maneuver with equipment.*
15.    All of the above may be performed wearing heavy and restrictive protective clothing/gear in excess of 50 pounds.*"

(Dkt. #53, ¶4.) The items noted with an asterisk are tasks which were assessed in the City's Physical Abilities Test ("PAT"), as set forth below. (Dkt. #53, ¶4.)

The Department was particularly interested in recruiting minorities and women for firefighter positions. (Dkt. #13, ¶7.) The Job Bulletin contained the following statement:

> The City of Madison is an equal opportunity employer functioning under an affirmative action plan. We encourage minorities, women and individuals with a disability to apply.

(Dkt. #13, ¶7.) The Department engaged in an active recruitment process for women which included putting on a women's workshop, visiting University of Wisconsin and area women's sports teams, advertising to targeted women's media (e.g., iWoman.com), and use of advertising highlighting women firefighters. (Dkt. #13, ¶8.)

Ms. Erdman applied for a Department firefighter position in 2013, seeking one of the positions that would be filled beginning in 2014. (Dkt. #53, ¶32.) A total of 1,887 applicants applied—146 women and 1723 men.[1] (Dkt. #53, ¶46.)

The hiring process consisted of several stages:

1. Application screening for minimum qualifications;
2. Written test;
3. PAT;
4. Oral board; and,
5. Chief's interview.

(Dkt. #53, ¶10.)

As a result of the hiring process, four women and thirteen men were hired by the Department. (Dkt. #53, ¶47.) All four women who passed the PAT were hired, which Chief Debra Amesqua testified was a higher percentage than usual. (Tr. Dkt. #67, 233:23-234:9.) Chief Steven Davis similarly testified that this is a percentage that would ebb and flow from year-to-year. (Tr. Dkt. #68, 159:20-160:8.)

## B. Background and Validation of the Department's PAT

Chief Amesqua was the fire chief for the Department from 1996-2012. (Tr. Dkt. #67, 204:15-16.) When she started this role, she wanted a validated hiring process. (Tr. Dkt. #67, 205:14-19.) It was of utmost importance that

---

[1] City statistics do not clearly indicate the gender of 18 of the applicants.

minorities and women were given a fair shake. (Tr. Dkt. #67, 206:18-207:6.) Chief Amesqua also wanted to develop a hiring process that improved the chances of candidates of lesser stature, whether because of race or sex. (Tr. Dkt. #67, 241:12-18.)

### i.     Test Formation

To foster these initiatives under the leadership of Chief Amesqua, the Department conducted a nationwide search for a consultant and ultimately selected Landry, Jacobs and Associates ("LJA"). (Tr. Dkt. #67, 207:9-19, 209:23-24.) LJA is an international consulting firm that builds promotion and selection tests primarily for public safety organizations around the country. (Tr. Dkt. #68, 4:4-7.) Working with LJA, the Department formulated three basic hiring components: written examination, physical agility test and oral interview. (Tr. Dkt. #67, 208:7-10, 209:9-13.)

LJA was co-founded by Dr. Rick R. Jacobs, an industrial psychologist, who testified at trial. (Tr. Dkt. #68, 6:24-7:3.) Dr. Jacobs has worked in the field since the early 1980's when he assisted in creating the first physical ability test for firefighters in 1985 for the City of Columbus. (Tr. Dkt. #68, 6:11-14.) Since then, his company has worked with 20 to 30 additional jurisdictions. (Tr. Dkt. #68, 6:14-16.)

In 1997, Dr. Jacobs worked with the Department to design its PAT. (Tr. Dkt. #68, 12:12-15.) The goal of the PAT was to maximize validity to ensure

there was a relationship between test scores and job performance and minimize adverse impact by having a representative group of candidates. (Tr. Dkt. #68, 12:23-13:3.)

In developing the City's PAT, LJA followed the *Uniform Guidelines on Employee Selection Procedures*, which outline evidence-based methods of ensuring that a test is related to a job skill. (Tr. Dkt. #68, 9:14-25.) Specifically, LJA performed a content validity study under the *Uniform Guidelines* where it studied the City's firefighting job, determined the required underlying abilities and then built tests around those findings. (Tr. Dkt. #68, 16:14-16.) As part of its content validity, LJA made on-site observations, met with firefighters regarding the details of their job, and met with supervisory personnel. It then developed a list 175 tasks that firefighters perform. (Tr. Dkt. #68, 17:16-18:10, 18-19.) Those tasks were organized into homogenous groups. From there, LJA analyzed tasks that it could turn into test events that were standardized and represented various aspects of the job. (Tr. Dkt. #68, 18:20-19:2.) The events were ordered to simulate the order that they would be experienced on the job. (Tr. Dkt. #68, 20:13-19.) A list of events was generated that was vetted with the City to ensure that the tasks matched the job. Chief Amesqua believed that the test components were representative of the critical skills of a firefighter in the City's Department. (Tr. Dkt #67, 215:20-24.) When

developing the PAT, Dr. Jacobs testified that LJA avoided testing components that could be learned on the job. (Tr. Dkt. #68, 65:24-66:6.)

Some testing scenarios use generic exercises like running a distance, push-ups, pull-ups, etc. Everyone gets a score, with the inference being that those who score higher are better able to perform the job. (Tr. Dkt. #68, 10:15-11:1.) LJA takes a different approach. To the extent possible, the tests it develops are designed to simulate particular job skills, while at the same time not being so specific as to test skills that can be learned in the academy or on-the-job. (Tr. Dkt. #68, 11:2-7.) This method is less abstract and better predicts job success. (Tr. Dkt. #68, 11:11-14.)

### ii.     Scoring

Once the events were finalized, LJA used a random and stratified sample of 94 Department firefighters to run through the test. (Tr. Dkt. #68, 22:7-10.) Those 94 firefighters were representative of the Department, meaning that if the Department was comprised of 14% women, 14% to 17% of the 94 firefighters selected were women. (Tr. Dkt. #68, 23:6-13.)

Each component of the PAT has a passing score. (Tr. Dkt. #68, 23:22-25.) Those were determined by looking at the incumbent distribution of scores by first removing the top 5% and bottom 5% of those scores to account for over and under performers. Second, the average score was calculated. Third, a cutoff score that was one standard deviation slower (or fewer repetitions on the pike

pole component of the test) was set, which roughly equates to the 16th percentile of performing incumbents. (Tr. Dkt. #68, 24:4-16.) Dr. Jacobs explained that it is nearly always the case that candidates outperform incumbents due to motivation factors. Because of this, a cutoff score at 16% of performing incumbents actually equates with about 6% of candidates. (Tr. Dkt. #68, 25:8-18.) Dr. Jacobs testified that using the 16th percentile achieves the goal of reducing adverse impact and increasing validity. (Tr. Dkt. #68, 29:21-20:3.)

Dr. Jacobs also testified that this is the best method to establish a cut score because it is based on local data from the very agency to which candidates are applying. (Tr. Dkt. #68, 24:21-24.) Chief Amesqua testified that the baseline test scores were set in a manner that allowed the Department to train employees to a higher level of physical fitness. (Tr. Dkt. #67, 240:8-13.)

In addition to each test component having a passing score, they also have a disqualification score. That was established at the lowest-performing incumbent. (Tr. Dkt. #68, 27:22-25.) To pass the PAT, a candidate must "pass" five of the seven events but for those events that were not passed, the candidate must have achieved the minimum score for the event. (Dkt. #37, ¶9.)

The interplay between cut scores and candidate washout in the academy was very important to Chief Amesqua because the City expended a significant amount of time and money to get candidates through the academy before they

are hired as part of a recruit class. (Tr. Dkt.# 67, 219:6-13.) The goal of the PAT was to bring individuals into the academy who already had basic skills the Department could work with and improve upon. (Tr. Dkt. #67, 219:20-23.)

### iii.    Revalidation

As described above, the Department first developed and had its hiring process validated by LJA in 1997. (Dkt. #53, ¶5.) The Department had its hiring process revalidated in 1999 by SHL Landy, Jacobs & Associates; in 2003 by SHL USA, Inc./EB Jacobs, LLC; and in 2013-2014 by Ergometrics & Applied Personnel Research, Inc. ("Ergometrics"). (Dkt. #53, ¶¶7-9.) Dr. Carl Swander is president, CEO and co-owner of Ergometrics. (Tr. Dkt. #68, 71:16-17.) He has spent nearly his entire career developing entry and promotional exams for police and fire departments across the country. (Tr. Dkt. #68, 71:24-72:1.)

Ergometrics was retained by the City to re-validate its PAT, video-based/written exam and oral board component which were already in place. (Tr. Dkt. #68, 72:12-18.) Under the *Uniform Guidelines*, Ergometrics performed a criterion and content validity study with respect to the test content and job demands. (Dkt. #53, ¶21; Tr. Dkt. #68, 74:16-22.) Dr. Swander testified that a content validity study was "definitely the most appropriate type of validity." (Tr. Dkt. #68, 74:22-25.)

As part of its content validation study, Ergometrics conducted a lengthy job analysis. (Tr. Dkt. #68, 73:2-6.) In doing so, it analyzed the work performed

by LJA while also conducting an independent job analysis and survey, the findings of which correlated with the findings of LJA. (Tr. Dkt. #68, 73:7-74:8) This included a physiological assessment of Department firefighters during exam performance. (Dkt. #13, ¶16.) Ergometrics' study specifically included a job analysis pursuant to the *Uniform Guidelines* and the *Amercian Psychological Association's Division 14 "Principles for the Validation and Use of Personnel Selection Procedures."* This included a job analysis involving document reviews, incumbent firefighter interviews and meetings, a review of physical tasks, a survey of firefighters, and an assessment of that data. (Dkt. #13, ¶19.) With respect to the PAT, Ergometrics tested incumbent firefighters on the PAT course, which included recording and timing their results and monitoring their heart rates. (Dkt. #13, ¶20.) Ergometrics found that the job had not significantly changed over time and that the test components accurately measured knowledge, skill and abilities that were required from Department employees. (Tr. Dkt. #68, 74:5-15.)

At the time of Ergometics revalidation, the PAT consisted of the following elements:

- Stair climb/stepmill

   This event required an applicant to step continuously on a step mill for four minutes and twenty-eight seconds with a weighted vest. The disqualification time was one minute and thirty seconds.

This event correlated directly with the job requirement that firefighters be able to climb stairs, which is normally the first task on the fireground.

- Ladder

  This event required an applicant to remove a ladder from the wall, rotate it as the applicant crosses the room, and place it flat on the floor within a marked area. The applicant then was required to go to a wall mounted ladder, stand in a marked box and raise, then lower, the ladder using a hand-over-hand motion. The applicant then had to go back to the other ladder and return it. The passing time was ninety seconds and the disqualification time was two minutes and five seconds.

  This event correlated directly with the necessity for firefighters to be able to carry and position ladders. This task is normally the second task on the fireground.

- Hose Drag

  This event required an applicant to pick up the end of a hose line and move through the course. An applicant was required to complete the course while pulling the hose in forty-nine seconds or less. The disqualification time was ninety seconds.

  This event correlated directly with the necessity for a firefighter to be able to deploy fire hoses.

- Sledgehammer

  This event required an applicant to successfully strike the hammer at a raised target twelve times. To pass, an applicant was required to do this in fourteen seconds or less. The disqualification time was thirty seconds.

This event correlated directly with the job requirement that a firefighter be able to use force to enter a building or room or vent a roof.

- Search

  This event required an applicant to move through a maze in a crouched position in darkness. To pass, an applicant was required to complete the event in one minute and thirteen seconds. The disqualification time was one minute and forty-five seconds.

  This event correlated directly with the necessity that a firefighter be able to move through unknown space in the dark, smoke conditions, and/or confined spaces.

- Rescue

  This event required an applicant to drag a mannequin through a lighted maze. To pass, an applicant was required to complete this task within fifty seconds. The disqualification time was ninety seconds.

  This event correlated directly with the necessity that a firefighter be able to remove an immobilized person from a fire scene.

- Pike Pole

  This event required an applicant to pick up a pike pole and push the door (fifty pounds) on the ceiling up until the indicator light went on and return the pole to its sleeve. The applicant then had to take a second pole, step back 18 inches, and pull the pole five times so that the indicator light went on and a weight (eighty pounds) hit the bottom each time. An applicant had to do this repetition as many times as possible within one minute. The applicant then had a rest time of thirty seconds at which time the cycle occurred again. This was done for a total of four cycles. To pass, an

> applicant had to complete twenty repetitions. The disqualification standard was sixteen repetitions.
>
> This event correlated directly with the requirement that firefighters be able to vent ceilings, roofs and walls while combatting a fire, often after the fire is out.

(Dkt. #13, ¶17; Dkt. #53, ¶27.)

Ergometrics found that all of these events were designed to simulate actual Department critical firefighting tasks and that each event was directly tied to the validated job analysis. In particular, Ergometrics found that Department firefighting duties involved physically demanding tasks which occur at least occasionally, require a great deal of physical effort, are critical to successful job performance, and require upper and lower body strength, aerobic capacity, coordination, and agility. (Dkt. #13, ¶18.) As shown above, the physical tasks assessed by the Department relate directly to tasks set forth in the job description as essential to the job of a firefighter. (Dkt. #13, ¶17; Dkt. #53, ¶27.)

With respect to the PAT's scoring process, this was also validated by Ergometrics, which found this normative approach very common and standard. (Tr. Dkt. #68, 86:5-20.) As part of its analysis, Ergometrics studied the average physiological response to the test, which was consistent with the data from the Candidate Physical Abilities Test ("CPAT") and other tests. (Tr. Dkt. #68, 87:11-24.) It also had subject-matter experts evaluate the

performance of incumbents who worked through the tests. (Tr. Dkt. #68, 87:25-88:3). Ultimately, Ergometrics concluded, and Dr. Swander testified, that the City's process of setting its cut scores using a normative approach with a mean and standard deviation was appropriate and data-driven. (Tr. Dkt. #68, 89:23-90:3.) "My conclusion is that the standards set were well-defined, minimum standards for performance on that exam that would define a minimum level of performance expectation that you would reasonably apply to your candidate pool." (Tr. Dkt. #67, 94:10-20.)

Chief Amesqua testified that the reliability of the PAT and other hiring components resulted in the hiring of talented, physically fit, well-performing, and diverse firefighters. (Tr. Dkt. #67, 223:9-21.) She was extremely proud of the 14% representation of women in the Department as compared to 5% nationwide. (Tr. Dkt. #67, 224:7-14.) Dr. Swander also testified regarding the success of the PAT. He described the City being extremely satisfied with the results it was getting from the PAT as the diversity of its Department was significantly higher than what was seen around the country. (Tr. Dkt. #68, 85:1-6.) In addition, those candidates who passed the PAT were typically successful in the training academy, which was important from a cost standpoint. (Tr. Dkt. #68, 85:10-86:1.) Likewise, Chief Davis testified that the PAT was a "real successful predictor of outcome. In other words, the people that passed our PAT were going to be successful in the academy as far as a

physical standpoint and physical ability standpoint." (Tr. Dkt. #68, 142:13-16.) In addition, Chief Davis believed that the Department was obtaining a diverse pool of applicants from the PAT. (Tr. Dkt. #68, 142:17-24.)

The City's PAT record demonstrates that a candidate who passes is physically ready and does not wash out of the academy based on physical performance. (Tr. Dkt. #68, 156:15-21.) The academy itself is quite physical and costs about $35,000 per recruit. (Tr. Dkt. #68, 156:24-157:15.) Since the PAT was initiated, there have been very few recruits who have washed out of the academy because of physical ability. (Tr. Dkt. #68, 157:16-19.)

Ms. Erdman's expert, Dr. Arthur Weltman, agreed that he has not analyzed the PAT under the *Uniform Guidelines*, nor has he read those guidelines in detail. (Tr. Dkt. #67, 55:10-16.) Indeed, he has formed no opinion as to whether the PAT comports with a content-based study under the *Unform Guidelines*. (Tr. Dkt. #67, 61:17-20.) Nor has he undertaken a review to determine whether or not the components that comprised the PAT are representative of critical firefighting skills. (Tr. Dkt. #67, 61:13-16.) Dr. Weltman testified that he has not studied data to determine whether there is an incumbent advantage with the PAT and agreed that if data suggests that candidates outperform incumbents in all aspects of the test, that eliminates his opinions regarding incumbent advantage. (Tr. Dkt. #67, 66:11-23.)

### iv.   The Pike Pole Component

In the CPAT, applicants are allowed to stand directly under the point to which they have hooked their pole in accomplishing the pull portion of that test. In the PAT, applicants can stand under the hook point to push up but must move 18 inches back when completing the pull portion of the test. (Dkt. #13, ¶30.) Numerous witnesses on behalf of the City testified regarding the safety rationale for the 18-inch setback line. Captain Jennifer Roman testified that when pulling down a ceiling, the best practice is to stand back at an angle to prevent the ceiling from falling on one's head. (Tr. Dkt. #67, 153:24-154:9.) The PAT, which has the 18-inch setback, represents this best practice. (Tr. Dkt. #67, 153:24-154:9.) City firefighter Frances Tatar testified that when using a pike pole during a fire, it is unsafe to stand underneath a ceiling. (Tr. Dkt. #67, 201:5-7.) Chief Amesqua testified about the importance of firefighters not pulling burning embers on top of themselves, which serves as justification for having candidates perform the pike pole test from a safe distance. (Tr. Dkt. #67, 221:13-22.) Even Ms. Erdman acknowledged that firefighters engaging in a pike pole operation should not be pulling debris down on them, which she agreed justifies the 18-inch setback. (Tr. Dkt. #67, 124:13-20.)

Ergometrics evaluated the pike pole component and specifically the 18-inch set-back. It determined that the setback is based on the sound reason and rationale. First, it creates a safety zone that prevents burning materials from

falling on a firefighter. Shorter candidates are able to adjust their hand position on the pole. Second, it provides a systemic way to measure candidates' performance on the test. In other words, it provides standardization in the administration of the test. The test does not test a candidates' knowledge of the job or training that they might receive on the job. (Tr. Dkt. #68, 79:24-81:20, 82:15-23.) Chief Davis reiterated this when he testified that use of the pike pole is generally not something learned over the course of the academy. (Tr. Dkt. #68, 164:13-165:1.) Chief Davis also testified that the pole was of sufficient length that anyone of any stature is able to grip it appropriately to perform the test. (Tr. Dkt. #68, 148:6-10.)

### v.     The Ladder Component

City firefighters are expected to individually remove a 24-foot ladder from rigs. (Tr. Dkt. #67, 144:8-12.) Chief Amesqua testified that the specifics of the ladder component of the PAT were formulated to match the equipment and trucks in use by the Department at that time. (Tr. Dkt. #67, 220:16-24.) In 1997, the Department's older rigs required firefighters to remove 24-foot extension ladders from the side of the engine. (Tr. Dkt. #67, 221:4-10.) "So if we had an old rig that still carried that ladder at that height, then I still needed those recruits to be able to perform that duty because they could be assigned anywhere during a shift." (Tr. Dkt. #67, 220:24-221:2.)

In 2013, 24-foot extension ladders were still being hung on the side of Department trucks. (Tr. Dkt. #67, 201:24-202:1.) Ergometrics specifically evaluated the ladder component of the test and concluded that while some of the newer trucks no longer required that ladders be stored on the outside of the truck, there was no guarantee that a firefighter would be using the new equipment, so it was critical that they be able to load and unload a ladder from a truck. (Tr. Dkt. #68, 79:1-18; Tr. Dkt. #67, 144:13-25.)

With respect to the part of the ladder test that requires candidates to replace the ladder, Chief Davis testified that this is representative of firefighting duties in both emergency and non-emergency situations (Tr. Dkt. #68, 148:16-149:13.)

### C. Ms. Erdman's Performance on the PAT

In 2014, Ms. Erdman passed the application screening and written test. (Dkt. #53, ¶33.) She then moved on to the PAT, which she did not pass.  (Dkt. #53, ¶33.) (Dkt. #53, ¶33.) While she successfully met the cut scores for five of the seven components of the PAT, she only completed twelve repetitions of the pike pole and, thus, was eliminated from the 2014 hiring process. (Dkt. #53, ¶36; Dkt. #13, ¶24.) Had she met the pike pole cut score of 16, she would have moved on to the next stage in the hiring process. (Dkt. #13, ¶24.)

In 2014, of the seven female applicants who performed the pike pole test, only one was disqualified (Ms. Erdman) for not meeting the threshold

standard. Of the 395 male applicants who performed the pike pole test, only 14 were disqualified. (Dkt. #13, ¶26.)

Also, Ms. Erdman did not receive a passing score on the ladder test because, while she was able to complete the test within the allotted time to avoid disqualification, she did not meet the cut score to "pass." (Dkt. #53, ¶35.)

### D. The Candidate Physical Ability Test ("CPAT")

The CPAT was developed based off of the City's PAT. (Tr. Dkt. #67, 135:3-5.) In 2013, the Department was aware of the existence of CPAT, considered it, and decided to continue to use the PAT. (Dkt. #53, ¶43.) Chief Amesqua became familiar with the CPAT in its early formation in the mid-90's and described it was very contentious and all over the board. (Tr. Dkt. #67, 225:10-22.) When the CPAT became more solidified, she again considered and rejected it because it was not properly validated, incumbents did not set the baseline and the testing equipment was not specific to the Department. (Tr. Dkt. #67, 226:1-6.)

If the City were to switch to the CPAT, it would be required to retain a consultant and validate the test using many of the same content-based processes it had already been through with the PAT, which was supported by years of data before the CPAT was ever solidified. (Tr. Dkt. #67, 228:23-229:3; Tr. Dkt. #68, 104:24-105:2.) Chief Amesqua testified that the cost of doing this would be exorbitant. (Tr. Dkt. #67, 231:21-23.)

Chief Davis likewise considered the CPAT and was critical of its lack of predictability for academy success. (Tr. Dkt. #68, 141:19-23.) He had specific concerns about components of the CPAT that he felt did not mirror the duties of a City firefighter. (Tr. Dkt. #68, 145:12-146:19, 149:14-24.) Due to this, Chief Davis concluded that it was in the City's best interest to continue with Ergonomics' validation study as opposed to adopting the CPAT. (Tr. Dkt. #68, 149:25-150:3.)

As part of its analysis, Ergometrics considered the CPAT, compared it to the PAT and concluded that it could not make any conclusions about the differences in adverse impact. (Tr. Dkt. #68, 95:21-25, 103:18-104:19.)

Chief Davis testified that the scoring of the PAT by individual event is consistent with firefighting practices that typically involve rapid work on a task followed by a recovery time. (Tr. Dkt. #68, 137:14-19.) The CPAT, on the other hand, has a single timed score for all events, which Chief Davis testified does not accurately represent a fire scene. (Tr. Dkt. #68, 137:25-138:4.)

If the Department had offered extended training to the 500 applicants who performed the PAT in 2014, it would have resulted in significant cost and overtime. (Tr. Dkt. #68, 170:18-21.) The City was concerned about the lack of uniformity in the CPAT's personal coaching in practice runs. (Tr. Dkt. #68, 155:17-25.) So that candidates were prepared, the Department created a video

and a prep guide, which it felt was a more equitable practice. (Tr. Dkt. #68, 156:3-7.)

### E. Ms. Erdman's Applications to the Department

Ms. Erdman has applied to the Department every two-year cycle since 2006. (Tr. Dkt. #67, 119:3-5.) She failed the written examination on five occasions in 2006, 2008, 2010, 2012, and 2018. (Tr. Dkt. #67, 119:12-19, 120:9-12.) Even if Ms. Erdman had passed the PAT in 2014, there were two significant steps left in the hiring process—the oral board and Chief's interview. (Dkt. #13, ¶10.) Only 17 out of 404 applicants who made it through the PAT were hired (4.2%). (Dkt. #13, ¶25.) When Ms. Erdman applied to the Department in 2016, the order of hiring events was changed such that the interview came before the PAT. She did not pass the interview. (Tr. Dkt. #67, 120:3-8.)

### F. The Present Litigation

Ms. Erdman filed this lawsuit on November 29, 2016, against the City claiming that PAT in the City's 2014 selection process for new firefighters had an unlawful disparate impact on women. (Dkt. # 1.) The City moved for summary judgment. (Dkt. # 12, *et seq*.) The district court granted part of the City's motion, holding that no reasonable trier of fact could find that, if Ms. Erdman had passed the 2014 PAT, she would have been hired as a City firefighter. (A-020, Dkt. # 47.) Ms. Erdman challenges that decision in this

appeal. The district court denied the City's argument that with respect to the pike pole event on which Ms. Erdman was disqualified, the PAT did not have a disparate impact. (A-011, Dkt. # 47.)

The case was tried to District Judge William M. Conley without a jury on October 15 and 16, 2018 (dkt. ## 64-65), and post-trial briefing was completed by December 21, 2018 (dkt. ## 75-76).

On July 20, 2022, the district court issued its Opinion and Order. (A-23, Dkt. # 81.) The court found that Ms. Erdman had proven that the 2014 PAT had "a disparate impact on female applicants, sufficient to satisfy her burden on the first element of a disparate impact claim." (A-32.) The court went on to find that the 2014 PAT "was job-related for the position and consistent with business necessity." (A-37.) The court added that "the Department met its obligation to investigate 'alternative selection procedures with evidence of less adverse impact . . . to determine the appropriateness of using or validating it in accord with [the Uniform] guidelines.' 29 C.F.R. § 1607.3(B)." (A-35, ellipses in original.)

Finally, the court ruled that the CPAT "Was Not Adequate." (A-37). It concluded that "plaintiff has not demonstrated by a preponderance of the evidence that the CPAT meets the Department's legitimate needs as an alternative to the 2014 PAT," (A-40). This finding led to the judgment of dismissal issued the same day (A-42) and has been appealed by Ms. Erdman.

## SUMMARY OF ARGUMENT

This is an employment discrimination case arising under Title VII. Ms. Erdman claimed below that the City's PAT had an unlawful adverse impact on female candidates and that the City refused to adopt a less discriminatory alternative which would have met its legitimate needs. The district court properly rejected Ms. Erdman's claim, and this court should affirm.

The district court properly granted summary judgment to the City on Ms. Erdman's claim for backpay and front pay because it was not "reasonably clear" that she would have secured the firefighter position but for the employment practice she claimed was discriminatory.

The district court correctly concluded that Ms. Erdman did not meet her third stage burden of proof to show that her proposed alternative test, the CPAT, would have met the City's legitimate needs. The district court made extensive findings of fact on the burdens and costs associated with adopting the CPAT and found that they outweighed its value. This conclusion is sound, supported by overwhelming evidence in the record, and should be affirmed.

Although the district court ultimately ruled in favor of the City and that ruling should be affirmed, this Court should alternatively rule that the City should have won outright at the summary judgment stage because Ms. Erdman failed to make a *prima facie* case of discrimination. This is because she did not introduce statistical evidence about the particular employment

23

practice which disqualified her from consideration for employment—the pike pole event. Ms. Erdman failed the pike pole event of the PAT and was disqualified for failing it. However, instead of introducing evidence about that particular aspect of the PAT which disqualified her, the district court permitted her to challenge the PAT as a whole. This was legal error which should be reversed and the City should have been granted summary judgment on those grounds.

## STANDARD OF REVIEW

Two standards of review apply to this case. The standard of review of a summary judgment decision is *de novo*. *G. M. Enterprises, Inc. v. Town of St. Joseph, Wis.*, 350 F.3d 631, 636 (7th Cir. 2003). The *de novo* standard of review applies to issues one and three below. The standard of review of findings of fact made at a bench trial is clearly erroneous. This applies to issue two below. Fed. R. Civ. P. 52(a)(6) provides: "Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility."  Since this case was ultimately decided after a trial to the court without a jury, any additional findings by the district judge must be accepted by a reviewing court unless they are "clearly erroneous." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564 (1985).

24

## ARGUMENT

**I.   The District Court Erred in Denying Summary Judgment to the City Because Ms. Erdman Failed to Make a Prima Facie Case of Discrimination.**

The district court should have granted the City summary judgment and dismissed Ms. Erdman's claims outright because she failed to make a *prima facie* case of discrimination. To make a *prima facie* case, Title VII requires plaintiffs to isolate the specific employment requirement that created the bar to opportunity. 42 U.S.C. § 2000e-2(k)(B)(i) (requiring plaintiffs to separate employment practices for analysis); *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 994 (1988) (holding that plaintiffs are responsible for "*isolating* and identifying the *specific* employment practices that are allegedly responsible for any observed statistical disparities.") (emphasis added).

Ms. Erdman failed to isolate and introduce evidence about the specific employment practice which disqualified her from employment. In 2014, the employment practice which disqualified Ms. Erdman from employment was the pike pole event. (Dkt. #53, ¶36; Dkt. #13, ¶24.) She obtained at least a minimum acceptable score on *every* PAT event *except* the pike pole event and would have proceeded on in the hiring process but for the pike pole event. (Dkt. #53, ¶36; Dkt. #13, ¶24.) Therefore, she should have been required to introduce evidence about the pike pole event's disparate impact. Instead, she wrongly focused on the PAT as a whole.

The district court wrongly excused Ms. Erdman from introducing evidence specific to the pike pole event and allowed her to proceed in challenging the PAT as a whole. (A-011, Dkt. # 47.) According to the district court, other courts "appear to have *uniformly* considered the entire PAT as an indivisible hiring practice." (A-013, Dkt. #47 (emphasis added).) This is wrong. At least one other district court faced with this *exact* issue analyzed a single physical event of a multi-part physical fitness test used for correctional officers. *See, Easterling v. State of Connecticut*, 783 F. Supp. 2d 323 (D. Conn. 2011). In that case, the plaintiff isolated the specific event of a multi-part fitness test that adversely affected her. Furthermore, other circuit courts of appeals lend support to the City's position.

Title VII's text supports the City's position because it requires plaintiffs to identify a "particular" employment practice that allegedly causes a disparate impact. It also prohibits plaintiffs from focusing on a broader decision-making process if that decision-making process is composed of discrete parts which are capable of separation. The relevant section of the statute provides as follows:

> With respect to demonstrating that a particular employment practice causes a disparate impact as described in subparagraph (A)(i), the complaining party shall demonstrate that each particular challenged employment practice causes a disparate impact, *except that if the complaining party can demonstrate to the court that the elements of a respondent's decisionmaking process are not capable of*

> *separation for analysis, the decisionmaking process*
> *may be analyzed as one employment practice.*

42 U.S.C. § 2000e-2(k)(1)(B)(i) (emphasis added). The words "except" and "shall" when read in conjunction clearly mandate plaintiffs to isolate components of a larger practice if those components *can* be separated. Only if the components are *inseparable* may plaintiffs challenge the larger practice *as a whole*. *Id.*

The structure of the Department's 2014 PAT clearly demonstrates that the elements of the PAT were separable for analysis. In 2014, the PAT was composed of seven separately scored and timed events: (1) stair climb/step mill; (2) ladder event; (3) hose drag; (4) sledgehammer; (5) search event; (6) rescue event; and (7) pike pole event. (Dkt. #13, ¶17; Dkt. #53, ¶27.) As Chief Davis testified, the scoring of the PAT by individual event is consistent with firefighting practices that typically involve rapid work on a task and then a recovery time. (Tr. Dkt. #68, 137:14-19.)

Ms. Erdman achieved at least a minimum acceptable score on every event except the pike pole event. (Dkt. #53, ¶36; Dkt. #13, ¶24.) *Had Ms. Erdman met the minimum acceptable score on the pike pole event, she would have proceeded on in the hiring process.* (Dkt. #13, ¶24.) Thus, it was the sole part of the PAT that disqualified her. Referencing the structure of the pike pole event, even the district court agreed that it was "relatively simple in this case

to separate out the particular PAT event that ultimately disqualified [Ms. Erdman] in 2014." (A-013; Dkt. #47.)

Despite agreeing that it was "relatively simple" to identify the pike pole event as the portion of the test that disqualified Ms. Erdman, the district court analyzed the PAT as a whole, asserting that courts "uniformly" analyze physical abilities tests as a whole rather than by their individual components. This is incorrect. In *Easterling v. State of Connecticut*, the district court successfully analyzed a single component of a 4-part fitness test and granted summary judgment to a plaintiff who alleged that the running component of a four-part physical fitness test had a disparate impact on female applicants. 783 F.Supp.2d at 325. The case stems from 2004 when Cherie Easterling applied to become a Correctional Officer ("CO") with the State of Connecticut Department of Correction ("DOC"). *Id.* She sued on behalf of herself and a class of others alleging that the DOC used a discriminatory physical fitness test ("PFT") which had a disparate impact on female candidates. *Id.* She claimed that the test was neither job-related nor consistent with business necessity. *Id.*

To become a CO, an applicant must have met the requisite educational, age, and health requirements. *Id.* at 326. Applicants then took a written exam, and if they passed the exam, they proceeded to the physical fitness test ("PFT") segment of the hiring process. *Id.* The PFT comprised four parts: (1) a sit and reach test; (2) a one-minute sit-up test; (3) a one-minute push-up test; and (4)

a timed 1.5-mile run. *Id.* The PFT had set pass times for corresponding age and gender groups. *Id.* In mid-2004, the plaintiff passed the written examination and she passed all components of the PFT except the 1.5-mile run portion. *Id.* at 326-27. As a result, she was not allowed to continue in the selection process. *Id.* at 327.

The plaintiff sued and identified the 1.5-mile run component of the PFT alone as the employment practice which caused a disparate impact on female applicants. *Id.* at 327-28. She identified three occasions in which the 1.5-mile run was administered, and the district court found that on each of those occasions, women passed the test at a substantially lower rate than men. *Id.* at 327. The district court had no difficulty analyzing a single component of the PFT. It made the following findings as to the three administrations of the PFT:

> Over the three administrations of the PFT at issue in this lawsuit, 398 women participated in the 1.5 mile run portion of the PFT, and 221 women passed, for a passage rate of 55.5%. For the same three administrations, 1,824 men participated in the 1.5 mile run portion of the PFT, and 1,434 men passed, for a passage rate of 78.6%. Overall, the ratio of the female passage rate to the male passage rate was 70.6%.

*Id.*

The district court was thus satisfied that the individual component of the PFT was a particular employment practice which resulted in a statistically significant percentage of women failing that component as compared to men.

It ultimately granted summary judgment to the plaintiff. *Id.* at 344. This demonstrates that plaintiffs *can* successfully isolate discrete elements of a multi-part physical abilities test and that they do not have to be analyzed in light of the test's other events. Accordingly, it was legal error not to require the plaintiff to have done so in this matter due to the plain text of 42 U.S.C. § 2000e-2(k)(1)(B)(i).

Sister circuit courts of appeals have also observed that the City's reading of the statute is sensible. For example, in *Davis v. Cintas Corp.*, Davis sued Cintas Corporation alleging, among other things, that the hiring system adopted by Cintas, called Meticulous Hiring System ("System"), had a disparate impact on women. 717 F.3d 476, 495 (6th Cir. 2013). The System included a number of objective and subjective hiring components. Ms. Davis alleged that the System's subjective elements, taken together, caused a disadvantage to women in hiring. *Id*. The Sixth Circuit framed the issue as follows:

> [T]he starting point of § 2000e–2(k) analysis is still some discrete 'employment practice,' that is, something that the employer does. That 'something' cannot be the hiring system itself, since § 2000e–2(k)(1)(B)(i) distinguishes an 'employment practice' from 'a respondent's decisionmaking process.' But whether the 'something' must be one isolated element of a multi-step hiring procedure, or whether it can include all of the elements of such a procedure that share a common characteristic (subjectivity, for example) is not entirely clear.

*Id.* at 496 (internal citation omitted). Ultimately, relying on the plain language of section 2000e-2(k)(1)(B)(i), the Sixth Circuit held that "Davis must identify *one specific step* of the Meticulous Hiring Process as a particular employment practice, rather than pointing to a group of steps that share a common characteristic." *Id.* (emphasis added). The court concluded that:

> Davis did not identify a 'particular employment practice' within the meaning of Title VII by pointing to all of the subjective elements in the Meticulous Hiring System. She could still survive summary judgment, however, if she showed that the Meticulous Hiring System's many steps were so intertwined that they were not capable of separation for analysis. As the district court noted, though, Davis did not explain why the well-defined, discrete elements of the Meticulous Hiring System are 'not capable of separation for analysis.' 42 U.S.C. § 2000e–2(k)(1)(B)(i).

*Id.* at 497.

*Easterling* and *Davis* instruct that the pike pole event is the proper unit of analysis rather than the PAT as a whole. Under facts incredibly similar to the ones at issue here, the plaintiff in *Easterling* was able to successfully isolate the specific event from a series of four which created her bar to opportunity. The PAT at issue this case is highly similar and comprises seven discrete events which were timed and scored separately and only one of which Ms. Erdman failed, creating her bar to employment opportunity. (Dkt. #13, ¶¶17, 24; Dkt. #53, ¶¶27, 36; Dkt. #13, ¶24.) The PAT events also tested

different skills and were measured using objective criteria. (Dkt. #13, ¶17; Dkt. #53, ¶27.) The district court even acknowledged that it was "relatively simple in this case to separate out the particular PAT event that ultimately disqualified [Ms. Erdman] in 2014." (A-013; Dkt. #47.) The pike pole event should therefore have been analyzed as the specific employment practice.

In 2014, Ms. Erdman was the only female candidate of seven who was disqualified for not completing the pike pole event. (Dkt. #13, ¶26.) This means that six other female applicants were able to complete the event, which corresponds with a female pass rate of 85.7%. Of the 395 male applicants who performed the pike pole test, only 14 were disqualified, for a pass rate of 96.5%. (Dkt. #13, ¶26.) Thus, the female pass rate was 88% of corresponding male applicants, which was within the EEOC's 80% compliance standard in assessing adverse impact. 29 C.F.R § 1607.4(D). Although Ms. Erdman introduced no evidence of the pike pole event's disparate impact, this evidence *is* in the record and supports a conclusion that the test component which eliminated her from hiring consideration had no disparate impact on females.

## II.  The District Court Correctly Concluded That Ms. Erdman Failed To Meet Her Third-Stage Burden of Proof That the CPAT Would Have Serviced the Department's Legitimate Needs.

The district court correctly concluded that Ms. Erdman failed to establish that the CPAT would have met the Department's legitimate needs. (A-037; Dkt. #81.) In so concluding, the district court made extensive factual

findings regarding the "cost[s] or other burdens" associated with adopting the CPAT. (A-037; Dkt. #81.) *Watson*, 487 U.S. at 998. The district court's factual findings on the burdens and costs to the City are reviewed for clear error. *See, Malachinski v. Comm'r*, 268 F.3d 497, 505 (7th Cir. 2001). It also properly refused to substitute its own judgment for the City's because "courts are generally less competent than employers to restructure business practices, and unless mandated to do so by Congress they should not attempt it." (A-040; Dkt. #81.) *Ernst v. City of Chicago*, 837 F.3d 788, 794 (7th Cir. 2016) (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 578 (1978)).

Ample evidence exists to support those findings on appeal. For example, the district court correctly credited at least four reasons identified by Chief Davis as to why adopting the CPAT would not serve the City's legitimate needs:

> (1) the need to perform a transferability study; (2) the PAT having been a good predictor of outcome historically, as defined by a high passage rate out of the academy; (3) the Department's comparatively high percentage of female firefighters, leading to a possible inference that the CPAT may have a favorable disparate impact on women but results in the washing out of ultimately unsuccessful applicants after the additional expenditure of time and money at the academy phase; and (4) certain elements of the PAT were designed specifically for Madison, in light of characteristics of the city, the Department's equipment or other considerations, including safety.

(A-040; Dkt. #81.) The City will explain why the district court's analysis was correct and should not be disturbed on appeal.

### A.     Transferability Study

The City would have to perform a transportability test for the CPAT which would merely mirror the process the City was engaged in with Ergometrics to revalidate the PAT. (Tr. Dkt. #67, 228:23-229:3; Tr. Dkt. #68, 104:24-105:2.) As Chief Amesqua testified, the cost of doing this would be exorbitant. (Tr. Dkt. #67, 231:21-23.) The district credited testimony from the City on this point, and it should not be disturbed on appeal.

### B.     Predictor of Success

The district court next found that candidates who succeed in the PAT have historically stood a good chance of not washing out of the academy later in the process at great expense to the City. (A-040; Dkt. #81.) It costs $35,000 to put a candidate through the academy. (Tr. Dkt. #68, 156:24-157:15.) Candidates who wash out at a later stage in the process represent a sunk cost to the City. The PAT's requirements helped ensure that the City's resources were being spent economically and not on candidates who ultimately would not pass the academy at a later stage.

The City also introduced testimony from Chief Amesqua which confirms that her decision-making process emphasized selecting a test which used test scores from Madison incumbents because that established a standard that the

applicants would be held to in training. (Tr. Dkt. #67, 219:20-23, 240:8-13.) Chief Amesqua testified that she did not want to wash applicants out of the academy at a large dollar cost. (Tr. Dkt.# 67, 219:6-13.) Thus, the district court correctly concluded that adopting the CPAT would be unduly burdensome and costly to the City.

### C.     High Percentage of Women Firefighters Under the PAT

The district court also found that even with using the PAT, the City was maintaining a high percentage of women in the Department (14%) despite rapid growth as compared to other departments using the CPAT. (Tr. Dkt. #67, 224:7-14.) Thus, the PAT was resulting in a gender-diverse workforce as compared to departments which were using the CPAT. The only logical conclusion to be drawn from that finding is that departments using the CPAT were either (1) experiencing an adverse impact similar to Madison; or (2) were washing applicants out of training at a higher and more expensive rate. The district court correctly found that the Department's high percentage of women firefighters was persuasive evidence of the PAT's efficacy and legality.

### D.     Specific Aspects of the PAT

The district court next concluded that adopting the CPAT would be burdensome and costly for the City because specific aspects of the PAT had been developed and tailored for the Department's specific needs.

For example, the City showed that the step mill portion of the PAT was designed to reflect the buildings in Madison and the number of flights of stairs that Madison firefighters would encounter. By contrast, the CPAT tested at a lower level. (Tr. Dkt. #67, 145:7-20.) Likewise, the rescue drag component in the PAT more accurately reflected a residential fire scene in Madison because it zig zags as opposed to the CPAT which is a straight drag. (Tr. Dkt. #67, 145:21-146:5.) The PAT's version of the sledgehammer component uses a vertical strike which is more in line with that tool's use in the field than the horizontal strike used in the CPAT. (Tr. Dkt. #67, 149:14-24.) The district court also acknowledged that the City presented "overwhelming" evidence regarding the ladder and pike pole events of the PAT and found that those two events were specially developed and tailored to the needs of the Department. (A-039; Dkt. #81.)

These represent a reasonable and legitimate basis for the City to continue to use the PAT rather than converting to the CPAT, which was not developed and scored specifically for City firefighters and which Ms. Erdman failed to show would create a workforce as diverse with respect to gender as the City.

### E.    Exact Replication

Ms. Erdman attempts to confuse the issues in this case by arguing that the PAT improperly tests skills which can be learned on the job. Indeed, the

36

*Uniform Guidelines* caution against using selections procedures which can be learned on the job.  29 C.F.R. §§ 1607.5(F) and 1607.14(C)(1). For this reason, Dr. Jacobs designed the PAT to avoid measuring tasks that can be impacted by training or an orientation period. (Tr. Dkt. #68, 11:2-7, 65:24-66:6.) Furthermore, as the record shows, the purpose of the PAT is not to measure skills which can be learned on the job. Rather, it is to measure the *abilities* which candidates must have to be successful in the field. Moreover, there is nothing in the record which establishes that the elements of the PAT, which more closely replicate Madison firefighting duties than the CPAT, are improved at a greater rate than the CPAT, through training or an orientation period than those elements of the CPAT.

## III.    The District Court Correctly Held That Ms. Erdman Was Not Entitled to Lost Wages Because It Was Not "Reasonably Clear" That She Would Have Been Offered the Position.

The district court correctly ruled on summary judgment that Ms. Erdman was not entitled to backpay and front pay relief. (A-020; Dkt. #47.) In so ruling, it correctly applied the operative legal standard to factual findings which may not be disturbed on appeal, absent a finding that they are clearly erroneous. *See, Malachinski*, 268 F.3d at 505.

In rejecting Ms. Erdman's demand for backpay and front pay, the district court correctly applied the holding of *Evans v. City of Evanston*, which requires plaintiffs to demonstrate with *reasonable clarity* that they would have received

the position in question but for the discriminatory practice. 881 F.2d 382, 385-86 (7th Cir. 1989). The district court correctly ruled that Ms. Erdman did not meet that bar and rejected her claim for backpay and front pay relief. (A-021; Dkt. #47.)

A brief explanation of *Evans* will add clarity to this discussion. In *Evans*, a group of female firefighter applicants who failed a physical agility test sued and demanded backpay relief. *Id.* at 383-84. The Seventh Circuit rejected the plaintiffs' demand for backpay because only a small percentage of individuals who passed the test were ultimately hired. *Id.* at 386. The court reasoned that such make-whole relief would be appropriate only if it had been "*reasonably clear* that, had it not been for the discriminatory behavior, the plaintiff would have got (or retained) the job or other employment benefit in issue, and where making the plaintiff whole would not unduly injure innocent third parties." *Id.* (emphasis added). Thus, because "only 1.2 percent of the applicants who passed the [PAT] . . . were actually hired," the Seventh Circuit held, "what the class members lost was not a job but a long-shot chance at a job." *Id.* This rationale is sound because plaintiffs should not receive backpay relief for a position which was not realistically within their grasp in the first place.

The district court's factual findings made clear that, under *Evans*, Ms. Erdman failed to meet her burden of proof. Specifically, the court found that Ms. Erdman was rejected multiple times for the firefighting position at

multiple stages of the hiring process. (A-021; Dkt. #47.) She applied for a firefighting position with the City in 2006, 2008, 2010, 2012, 2014, 2016, and 2018. (Tr. Dkt. #67, 119:3-5.) In 2006, 2008, 2010, 2012, and 2018 she failed the written test. (Tr. Dkt. #67, 119:12-19, 120:9-12.) In 2014, she passed the written test, but failed the PAT. (Dkt. #53, ¶33.) She applied again in 2016, when the City changed the order of steps in the hiring process, and as a result, the PAT was moved to the last step in the process. (Tr. Dkt. #67, 120:3-8.) In 2016, Ms. Erdman passed the written test, but did not pass the chief's interview. (Tr. Dkt. #67, 120:3-8.) Given these facts, the court granted the City's motion for summary judgment with respect to back pay:

> Plaintiff has failed to put forth evidence from which a reasonable factfinder could find it was 'reasonably clear' that she would have been hired in 2014 but for the PAT. Accordingly, the court will grant summary judgment to defendant on plaintiff's request for an award of front or back pay damages, finding such an award would be overly speculative.

(A-021-022; Dkt. #47.) Given that Ms. Erdman had failed to be hired on multiple occasions and for other reasons *unrelated to the PAT*, the district court correctly concluded that she was not entitled to backpay or front pay.

Sidestepping her poor previous performances, Ms. Erdman argues that because all four female candidates who passed the PAT in 2014 were ultimately hired, that she, too, had a 100 percent chance of being hired but for the PAT. Analyzed this way, Ms. Erdman asserts, she has met her burden of

demonstrating an entitlement to make-whole relief. Ms. Erdman is wrong because, as the district court found, *four applicants is too small of a sample size to infer that Plaintiff would have been hired just the same*. (A-021; Dkt. #47.) Moreover, both chiefs testified that this was not a normal representation. (Tr. Dkt. #67, 233:23-234:9; Tr. Dkt. #68, 159:20-160:8.) Thus, her contention lacks merit. Furthermore, even if Ms. Erdman *had* passed the 2014 PAT, she still had to complete two more stages: the oral board and the chief's interview. As the record reflects, Ms. Erdman was not hired in 2016 even though she had progressed to the chief's interview and had failed the written test on numerous other occasions. (Tr. Dkt. #67, 119:12-19, 120:3-12.) Thus, she did not stand a 100% chance of being hired in 2014 as she asserts because she failed different aspects of the hiring process. This makes her situation akin to the plaintiffs in *Evans* because what she lost out on in 2014 was not a job, but a "long-shot chance at a job."

Ms. Erdman has therefore failed to put forth evidence from which a reasonable factfinder could find it was "reasonably clear" that she would have been hired in 2014 but for the PAT. This court should affirm the district court's denial of backpay and front pay.

## CONCLUSION

The City respectfully requests that this Court reverse the district court's decision denying its motion for summary judgment on the grounds that Ms.

Erdman failed to make a prima facie case of discrimination, affirm the district court's decision that Ms. Erdman failed to meet her third-stage burden that the CPAT would have served the Department's legitimate needs and affirm the district court's decision granting its motion for summary judgment on the grounds that Ms. Erdman was not entitled to lost wages.

Dated this 12th day of May, 2023.

/s/ *Kathryn A. Harrell*
Kathryn A. Harrell
Storm B. Larson
BOARDMAN & CLARK LLP
One South Pinckney Street, Suite 410

Madison, Wisconsin  53701-0927
(608) 257-9521
kharrell@boardmanclark.com
slarson@boardmanclark.com
*Attorneys for Defendant-Appellee*
*City of Madison*

**CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7)**

Pursuant to Fed. R. App. P. 32(a)(7)(C), the undersigned counsel certifies that this response brief:

(i)      complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 9,547 words, including footnotes and excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii); and

(ii)      complies with the typeface requirements of Fed. R. App. P. 32(a)(5), as modified by Circuit Rule 32(b), and the type style requirements of Fed. R. App. P. 32(a)(6).

DATED:  May 12, 2023.


BOARDMAN & CLARK LLP

*/s/ Kathryn A. Harrell*
Kathryn A. Harrell

*Attorneys for Defendant-Appellee*
*City of Madison*

## CERTIFICATE OF SERVICE

I certify that, on May 12, 2023, I electronically filed Defendant-Appellee's Response Brief with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all registered users. All parties have consented to receive electronic service and will be served by the ECF system. I have also served two copies on Plaintiff-Appellant by placing those copies in the United States Mail, postage paid, addressed as follows:

Jeff Scott Olson
The Jeff Scott Olson Law Firm, S.C.
Waunakee, WI 53597-2502

DATED:  May 12, 2023

BOARDMAN & CLARK LLP

*/s/ Kathryn A. Harrell*
Kathryn A. Harrell

*Attorneys for Defendant-Appellee*
*City of Madison*