Appeal No. 22-2433

In the

# United States Court of Appeals

### For the Seventh Circuit
**Chicago, Illinois  60604**

CATHERINE ERDMAN,

      Plaintiff – Appellant,

          v.

CITY OF MADISON,

      Defendant – Appellee.

On Appeal from the United States District Court
For the Western District of Wisconsin,
The Honorable Judge William M. Conley Presiding,
District Court Case No: 3:16-cv-00786-wmc

## Reply Brief of Plaintiff–Appellant

Jeff Scott Olson
THE JEFF SCOTT OLSON LAW FIRM, S.C.
1025 Quinn Drive, Suite 500
Waunakee, WI 53597-2502
608-283-6001
jsolson@scofflaw.com

*Counsel of Record for Plaintiff-Appellant*

Appeal No. 22-2433

# In the
# United States Court of Appeals
### For the Seventh Circuit
**Chicago, Illinois  60604**

CATHERINE ERDMAN,

      Plaintiff – Appellant,

          v.

CITY OF MADISON,

      Defendant – Appellee.

On Appeal from the United States District Court
For the Western District of Wisconsin,
The Honorable Judge William M. Conley Presiding,
District Court Case No: 3:16-cv-00786-wmc

### Reply Brief of Plaintiff–Appellant

Jeff Scott Olson
THE JEFF SCOTT OLSON LAW FIRM, S.C.
1025 Quinn Drive, Suite 500
Waunakee, WI 53597-2502
608-283-6001
jsolson@scofflaw.com

*Counsel of Record for Plaintiff-Appellant*

## TABLE OF CONTENTS

TABLE OF CONTENTS...............................................................................i

TABLE OF AUTHORITIES ..................................................................... iii

ARGUMENT ..............................................................................................1

I.    This Court Ought Not Reverse the District Court's Decision
to Deny the City's Motion for Summary Judgment. ........................ 1

A.    A District Court's Decision to Deny a Motion for Summary
Judgment is not Appealable after a Full Trial on the Merits. ........ 2

B.    The unit of analysis for disparate impact purposes must be
the PAT as a whole, not each of its seven individual components.
.....................................................................................................3

1.    The Seventh Circuit has specifically rejected efforts to
parse disparate impact at a finer level of analysis than the test
as a whole.........................................................................................3

2.    Previous cases adjudicating disparate impact claims
based on pre-employment testing analyze the impact of the
test as a whole. ................................................................................4

3.    The Uniform Guidelines define "selection procedure" at
the level of the test as a whole, not individual questions or
components. ...................................................................................10

4.    The cause of a disparity in male-female passing rates in
the later events of a seven-component test that has a disparate
impact on women as a whole may be that women are
disproportionately affected by fatigue from the earlier
components that are unfair to women. .....................................11

5.    There are sound reasons not to divide tests into individual questions or tasks for purposes of disparate impact analysis. ..........................................................................................15

    a.    To a large extent, the questions or tasks on a given test are intended to measure the same thing. ...............................15

    b.    Elimination of some subjects by earlier components skews the pool of applicants participating in later components. ..............................................................................17

    c.    Focusing on individual components of a test will inevitably make statistical analysis difficult or impossible. 20

    d.    Time limits and the weighted belt tie the components of the test together. ...................................................................21

    e.    Unitary scoring makes for a unitary test. ......................22

6.    The City's proposed level of analysis is unworkable at the third stage. ...............................................................................23

7.    The City's proposed level of analysis will create ludicrous scenarios in the cases involving tests with dozens of questions. ......................................................................................24

II.    The City Fails to Rebut Ms. Erdman's Third-Stage Arguments. ............................................................................................ 26

A.    The District Court Did Not Make Extensive Factual Findings. ............................................................................................27

    1.    The Transferability Study to Adopt the CPAT would be Simple and Cheap. ......................................................................27

    2.    There is No Evidence that Candidates who Passed the CPAT would Wash Out of the Academy at a Higher Rate than Candidates who Passed the PAT. ......................................30

3.    The Relatively High Percentage of Female Firefighters in the Madison Department does not Help to Prove that the PAT is Better than the CPAT. ..............................................................31

4.    The PAT's Replication of Madison Firefighters' Unique Duties Hurts the City's Case.......................................................34

CONCLUSION ..........................................................................................36

Rule 32(a)(7) CERTIFICATION ...............................................................38

FORMER CIRCUIT RULE 31(e) CERTIFICATE...................................38

CERTIFICATE OF SERVICE....................................................................39

## TABLE OF AUTHORITIES

### CASES

*Albemarle Paper Co. v. Moody,* 422 U.S. 405 (1975) ...................................9
*Allen v. Seidman*, 881 F.2d 375 (7th Cir. 1989)..........................................3
*Arndt v. City of Colorado Springs*, 263 F. Supp. 3d 1071 (D. Colo. 2017)
.................................................................................................................5
*Berkman v. City of New York*, 536 F. Supp. 177 (E.D.N.Y. 1982),
affirmed, 705 F.2d 584 (2d Cir. 1983) ............................................5, 19
*Bew v. City of Chicago*, 979 F. Supp. 693 (N.D. Ill. 1997).........................8
*Carroll v. Sears, Roebuck & Co.*, 708 F.2d 183 (5th Cir. 1983) ..................6
*Davis v. Cintas Corp.*, 717 F.3d 476 (6th Cir. 2013) ................................14
*Dupree v. Younger*, No. 22-210, 2023 WL 3632755 (U.S. May 25, 2023)2
*E.C. Dothard v. Rawlinson*, 433 U.S. 321 (1977) ......................................20
*Easterling v. State of Connecticut*, 783 F. Supp. 2d 323 (D. Conn. 2011) 9

*Ernst v. City of Chicago*, 837 F.3d 788 (7th Cir. 2016) .........................5, 15
*Fudge v. City of Providence Fire Dep't,* 766 F.2d 650 (1st Cir. 1985) .......6
*Griggs v. Duke Power Co.*, 401 U.S. 424 (1971).....................................6, 24
*Julien v. Scott*, No. C 96-1858-CAL, 1998 WL 410896 (N.D. Cal. July
    17, 1998), aff'd sub nom. *Julien v. Cty. of Alameda*, 189 F.3d 473 (9th
    Cir. 1999) ..............................................................................................18
*Ortiz v. Jordan*, 562 U.S. 180 (2011)............................................................2
*Pouncy v. Prudential Ins. Co. of Am.*, 668 F.2d 795 (5th Cir. 1982) .........8
*Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989) .....................................8
*Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 (1989).......................9, 18
*Watson v. Fort Worth Bank & Trust*, 487 U.S. 977 (1988).................7, 8, 9

## TREATISES

Yiyang Wu, Scaling the Wall and Running the Mile: The Role of
    Physical-Selection Procedures in the Disparate Impact Narrative,
    160 University of Pennsylvania Law Review, 1195 (2012) ...............6
Mohsen Tavakol and Reg Dennick, Making sense of Cronbach's
    alpha, International Journal of Medical Education. 2011 ...............17

## REGULATIONS

29 C.F.R § 1607.4(D)...................................................................................5
29 C.F.R. § 1607.1 B..................................................................................10
29 C.F.R. § 1607.5(F) ................................................................................34

## ARGUMENT

Not every argument set forth in the City's Brief is cited and directly rebutted here, not because Erdman concedes these points, but because the counter-argument has already been made in her principal brief.

## I.     This Court Ought Not Reverse the District Court's Decision to Deny the City's Motion for Summary Judgment.

The City argues that the "district court should have granted the City summary judgment and dismissed Ms. Erdman's claims outright" because Ms. Erdman "should have been required to introduce evidence about the pike pole event's disparate impact. Instead, she [and the court below] wrongly focused on the PAT as a whole." (City Brief at 25.)

1

### A. A District Court's Decision to Deny a Motion for Summary Judgment is not Appealable after a Full Trial on the Merits.

In *Ortiz v. Jordan*, 562 U.S. 180 (2011), the Supreme Court, resolving a conflict among the circuits, held that a party generally cannot appeal an order denying a motion for summary judgment on a given issue after a full trial of the same issue on the merits.

The only exception appears to be in situations where the request for summary judgment was based on "purely legal" issues, meaning "issues that can be resolved without reference to any disputed facts." *Dupree v. Younger*, No. 22-210, 2023 WL 3632755, at *4 (U.S. May 25, 2023).

For reasons that are explained below, the question presented -- whether the unit of disparate impact analysis where the selection device at issue is a test should be the test as a whole or each individual question or event on the test  -- is not a purely legal question but is inextricably intertwined with the facts. Nonetheless, in the event that the court believes this issue to be appealable, she also counters the City's arguments on their merits.

2

>    **B.     The unit of analysis for disparate impact
>            purposes must be the PAT as a whole, not each
>            of its seven individual components.**

This issue was extensively briefed in the court below, both on

summary judgment (dkt. ## 14, 32, 40), and, at the court's request,

again, before trial (dkt. ## 54, 55).  To the extent the trial evidence

illuminated the issue, it supported Ms. Erdman's position.

>        **1.     The Seventh Circuit has specifically
>                rejected efforts to parse disparate impact
>                at a finer level of analysis than the test as
>                a whole.**

This Court has given valuable guidance on the matter. In *Allen*

*v. Seidman*, 881 F.2d 375, 381 (7th Cir. 1989), an employer-defendant

in a disparate-impact case tried to persuade the Court to require the

plaintiff to pinpoint those aspects of a selection test that caused it to

have a statistically significant disparate impact on black applicants.

The court rejected this effort:

>    The Corporation argues that  . . . even if the Program
>    Evaluation test was a bad test the plaintiffs failed to
>    pinpoint particular aspects of it that were unfavorable
>    to blacks. . . .  However, nothing in the structure of a
>    disparate-impact case requires such pinpointing;

whether the reason for the test's disparate impact can be identified is merely another issue bearing on the correct interpretation of the plaintiffs' statistics.

*Id*., 881 F.2d 375, at 381.

> **2. Previous cases adjudicating disparate impact claims based on pre-employment testing analyze the impact of the test as a whole.**

The City suggests that the statistical analysis of disparate

impact be conducted at the level of the single test component that

disqualified Ms. Erdman - the pike pole component. The City then

points out that:

In 2014, Ms. Erdman was the only female candidate of seven who was disqualified for not completing the pike pole event. This means that six other female applicants were able to complete the event, which corresponds with a female pass rate of 85.7%. Of the 395 male applicants who performed the pike pole test, only 14 were disqualified, for a pass rate of 96.5%. Thus, the female pass rate was 88% of corresponding male applicants, which was within the EEOC's 80% compliance standard in assessing adverse impact.

(City Brief at 32, citing 29 C.F.R § 1607.4(D).) The City contends that the Plaintiff cannot demonstrate the disparate impact of this component.

The City cites no case in which a disparate impact claimant has been limited by a court to an analysis of only the single component of a physical ability test that washed her out. Courts uniformly conduct their statistical analysis at the level of the test as a whole, even in the cases that acknowledge the presence of different components in a test (and sometimes even discuss individual components' strengths and weaknesses). *See e.g. Berkman v. City of New York*, 536 F. Supp. 177 (E.D.N.Y. 1982), affirmed, 705 F.2d 584 (2d Cir. 1983); *Ernst v. City of Chicago*, 837 F.3d 788, 791 (7th Cir. 2016); *Arndt v. City of Colorado Springs*, 263 F. Supp. 3d 1071 (D. Colo. 2017). Reported cases applying disparate impact analysis to physical ability tests consistently analyze the success rates by sex on the whole test. *See, e.g.*, Yiyang Wu, Scaling the Wall and Running the Mile: The Role of Physical-Selection Procedures in the Disparate

5

Impact Narrative, 160 University of Pennsylvania Law Review, 1195, 1212, n. 82 (2012).[1]

From its inception, the disparate impact doctrine has consistently been applied to analyze a challenged test as a whole. *See e.g., Griggs v. Duke Power Co.*, 401 U.S. 424, 430 (1971)("tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices."); *Fudge v. City of Providence Fire Dep't,* 766 F.2d 650, 652 (1st Cir. 1985)(focusing analysis on written test as a whole where "the selection procedure was based upon a composite score of 60 in three categories: scholastic attainment, military service, and a written entrance examination." *)*

In *Carroll v. Sears, Roebuck & Co.*, 708 F.2d 183, 189 (5th Cir. 1983), the court said: "The use of a test is a specific, facially neutral selection criterion that can be shown to have a causal connection to a

---

[1] available online at
http://scholarship.law.upenn.edu/penn_law_review/vol160/iss4/6/, last accessed June 2, 2023.

racial imbalance in the work force. This selection criterion is the kind
of employment practice to which the disparate impact model
traditionally has applied."

The City cites *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977,
994 (1988)[2] for the proposition that plaintiffs are responsible for
"isolating and identifying the specific employment practices that are
allegedly responsible for any observed statistical disparities." (City
Brief at 25.)  The Court deciding *Watson* was hardly the first to
emphasize the need to focus a plaintiff's statistical analysis on a
single component of a selection process, but no court has ever
decided that it was *necessary* to divide a *test* into parts and analyze
the impact of each part. *See, e.g.*, *Pouncy v. Prudential Ins. Co. of Am.*,

---

[2] This case extended the disparate impact theory to include subjective
selection practices, which are not at issue in the case at bar:

> We granted certiorari to determine whether the court below
> properly held disparate impact analysis inapplicable to a
> subjective or discretionary promotion system, and we now
> hold that such analysis may be applied. We express no
> opinion as to the other rulings of the Court of Appeals.

*Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 993 (1988).

668 F.2d 795, 800 (5th Cir. 1982)("The disparate impact model applies only when an employer has instituted a specific procedure, usually a selection criterion for employment, that can be shown to have a causal connection to a class based imbalance in the work force. Thus, a disparate impact analysis may be used to challenge aptitude and intelligence tests . . .").

Nor have courts deciding cases since *Watson* ever *chosen*, against argument to the contrary, to parse disparate impact analysis at a level finer than a test as a whole. *See, e.g.*, *Price Waterhouse v. Hopkins*, 490 U.S. 228, 242 (1989)("An employer may not, we have held, condition employment opportunities on the satisfaction of facially neutral tests or qualifications that have a disproportionate, adverse impact on members of protected groups when those tests or qualifications are not required for performance of the job." (*citing Watson*)).

See *Bew v. City of Chicago*, 979 F. Supp. 693 (N.D. Ill. 1997):

To make out a prima facie case of disparate impact, the plaintiff must show "that the tests in question select applicants for hire or promotion in a racial pattern

8

> significantly different from that of the pool of
> applicants." *Albemarle Paper Co. v. Moody,* 422 U.S. 405,
> 425 (1975). The plaintiff "'must begin by identifying the
> specific employment practice that is challenged'." *Wards
> Cove Packing Co. v. Atonio*, 490 U.S. 642, 656 (1989)
> (quoting *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977,
> 994, (1988)). The employment practice at issue is the
> Certification Examination; upon failing this exam, a
> probationary police officer is fired.

*Id.*, 979 F. Supp. 693, at 695.

The City does cite to a case in which the Plaintiff *chose* to
present evidence as to a single component of a physical test,
*Easterling v. State of Connecticut*, 783 F. Supp. 2d 323, 332 (D. Conn.
2011). (City Brief at 26.)  In that case, apparently neither party
suggested that the analysis ought to be conducted at the level of the
test as a whole and the court never discussed the issue. One case
litigated by consent under a unique and different legal standard
cannot help this Court reason its way to a correct choice where the
matter is contested.

### 3. The Uniform Guidelines define "selection procedure" at the level of the test as a whole, not individual questions or components.

The entire thrust of the Uniform Guidelines on Employee

Selection Procedures is "to assist employers, labor organizations,

employment agencies, and licensing and certification boards to

comply with requirements of Federal law prohibiting employment

practices which discriminate on grounds of race, color, religion, sex,

and national origin." 29 C.F.R. § 1607.1 B. (Exhibit 51, p. 1.) The

Guidelines require analysis and validation of "selection procedures

which are used as a basis for making employment decisions," §

1607.2 C. (Exhibit 51, p. 2.) and contain the following definition:

> Selection procedure. Any measure, combination of
> measures, or procedure used as a basis for any
> employment decision. Selection procedures include the
> full range of assessment techniques from traditional
> paper and pencil tests, performance tests, training
> programs, or probationary periods and physical,
> educational, and work experience requirements
> through informal or casual interviews and unscored
> application forms.

10

§ 1607.16 Q (Exh. 51, p. 16).  A test is a "selection procedure." There is not the slightest hint that an individual question in a "paper and pencil test" or an individual component of a "performance test" is a "selection procedure," or that an employer may have an obligation to conduct a validity analysis at a level finer than its test as a whole.

> **4.    The cause of a disparity in male-female passing rates in the later events of a seven-component test that has a disparate impact on women as a whole may be that women are disproportionately affected by fatigue from the earlier components that are unfair to women.**

Unfair components of a test -- that is, components that women find more difficult than men for reasons that do not augur poor performance by women on the job -- may not express their unfairness exclusively through a disparity in passing rates on those particular components. It may be that two individual components of a test each excludes a statistically insignificant number of females, but combined, the test as a whole excludes a statistically significant number. It would not serve the underlying purpose of Title VII to allow clever employers to craft tests made up of components that

11

each individually cull only an insignificant portion of a minority

group to avoid liability, when the test as a whole results in a

significant portion of minority applicants being excluded from

employment.

Female applicants may survive or pass unfair components

that occur earlier in the test but be exhausted by them to the point

that their performance on the later components is compromised. As

Chief Popovich testified, when asked about a recommendation in a

September 25, 2013, email, from Ergometrics, containing a list of

recommendations, (Exhibit 30):

Q     In the -- down on the next page here where they
get to event No. 7, the ceiling pike pole event, they say
"Event challenging even for current incumbents." Was
that true?

A     It's hard to put a definition on what "challenging"
means, but that's the seventh of seven stations. People
are usually very, very exhausted at that seventh station.

(Transcript, dkt. # 67, 1-168:4-9.)

If the unfairness to women of earlier events expresses itself,

not just in their higher rates of failing or being disqualified by those

12

events, but also in the women who survive them being more
disabled by exhaustion than their male competitors by the time they
reach the last event, it is illogical to consider any of the events --
either the earlier ones or the last one -- in isolation.

Ms. Erdman obtained a failing score on the ladder component
of the PAT, but the City contends that it can be excluded from the
disparate impact analysis because she still could have passed the
entire PAT had she secured passing scores on five other components
and not been disqualified.  Women who find the ladder component
challenging because they are not tall enough to pull the ladder off
the elevated rack and replace it quickly and deftly probably work as
hard as they can throughout the ladder component to try to finish in
a passing time. If the ladder component was unfair to women, they
were likely more fatigued by it than male test-takers were, and if,
like Ms. Erdman, they nonetheless failed to achieve a passing score,
they would have had to work even harder on subsequent
components than male test-takers who had passed the ladder
component, because they had less margin for error after failing it.

13

The ladder component may well impact the overall disparate impact on women of the test as a whole, not only because of the scores they achieve on it compared to men, but because it may impact any individual woman's performance on the *subsequent* components, including the final one.

In other words, it is obvious that in a physical test comprised of multiple components administered in quick succession, an unfair component can contribute to the overall disparate impact of the test as a whole even without absolutely disqualifying any particular applicants. Such an effect could not be measured by comparing failure and disqualification rates on individual events. This means that the elements of the PAT are "not capable of separation for analysis." (City Brief at 31, quoting *Davis v. Cintas Corp.*, 717 F.3d 476, 497 (6th Cir. 2013).

It would appear that the City of Madison deserves credit for coming up with a completely new theory of defense: Except for *Easterling v. State of Connecticut*, 783 F. Supp. 2d 323, 332 (D. Conn. 2011) even cases that *discuss* the individual components of physical

ability tests in terms of their job-relatedness never even hint at

separately analyzing each component's statistical impact by gender.

*See*, *Ernst v. City of Chicago*, 837 F.3d 788, 796 (7th Cir. 2016)("To

prove a disparate-impact case, a plaintiff must show an adverse

impact on employees with a protected characteristic like gender.

Chicago concedes that its physical-skills entrance test has an adverse

impact on women.")

     As will be shown, there is good reason for this state of

disparate impact jurisprudence.

> **5. There are sound reasons not to divide
> tests into individual questions or tasks for
> purposes of disparate impact analysis.**
>
> a. To a large extent, the questions or tasks on
> a given test are intended to measure the
> same thing.

     The City's PAT certainly looks like a single "specific

employment practice:" It has a name. It is scored as a unit: Seven is a

perfect score and five is a passing score. It must be completed all at

once: An applicant cannot run through the first four components,

then go home, and come back the following week to finish the last

three.  While each component of the test is intended, to an extent, to assess a specific and somewhat different capability, each component and the test as a whole are also intended to assess the same things: strength, coordination, and stamina, meaning the ability to perform despite having already expended substantial effort.

When the City says that its PAT has a high degree of internal consistency, as measured by its Cronbach's alpha score (Swander Report, Exhibit 47, p. 17 of 39), what it is really saying is that all of the components of the test measure the same thing.[3]

---

[3] The City's response to the Plaintiff's argument that it has never looked at the test-retest reliability of its PAT is, "In the field of selection, reliability, statistically reported, is almost always internal consistency reliability (Cronbach's Alpha). "(Swander Report, Exhibit 47, p. 17 of 39.) But "internal consistency reliability" is a very different animal from test-retest reliability.  Test-retest reliability requires looking at whether the scores of subjects who take a test more than once will be reasonably consistent. If test scores are wildly variable from one test repetition to another, it is hard to see how it can be a trustworthy instrument to assess *any* capability. But internal consistency simply looks at whether the different parts of a test all measure the same thing:

> Alpha was developed by Lee Cronbach in 1951 to provide a measure of the internal consistency of a test or scale; it is expressed as a number between 0 and 1. Internal consistency describes the extent to which all the items in a test measure the same concept or construct and hence it is connected to the inter-relatedness of the items within the test.

Some of the factors that make it inappropriate to divide the

test by components for analytic purposes merit a deeper look.

> b. Elimination of some subjects by earlier
> components skews the pool of applicants
> participating in later components.

A candidate who fails to meet the minimum performance

standard on any component of the seven-component Physical

Ability Test is eliminated. That means that the least able candidates

will already have been eliminated by the time the final, pike-pole,

component of the test is reached. In this case, of the 28 women who

appeared to take the test, three quit during the test at some point

and nineteen were disqualified prior to reaching the pike-pole

component. (A-7.) Only the fittest, strongest, most able and

determined women were still around to succeed or fail on that final

component of the test.

---

Mohsen Tavakol and Reg Dennick, Making sense of Cronbach's alpha,
International Journal of Medical Education. 2011; 2:53-55, available online
at https://www.ijme.net/archive/2/cronbachs-alpha.pdf, last accessed
June 2, 2023.

17

But the Supreme Court has not authorized lower courts to engage in analysis of the disparate impact of a challenged employment practice on such a small and elite group. A plaintiff makes out "a prima facie case of discrimination" when she "has shown that the test in question selects applicants in a pattern "significantly different *from that of the pool of applicants*." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425 (U.S. 1975)(emphasis supplied). After *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 652 (1989), more cases use the term "qualified applicants," but it is used in a broad sense. *See, e.g.*, *Julien v. Scott*, No. C 96-1858-CAL, 1998 WL 410896, at *5 (N.D. Cal. July 17, 1998), aff'd sub nom. *Julien v. Cty. of Alameda*, 189 F.3d 473 (9th Cir. 1999)("Disparate impact cases usually focus on statistical disparities between the pool of qualified applicants and the group of those hired or promoted.")

In this case, everybody who was permitted to take the PAT had already survived the earlier components of the hiring process, and was qualified for hire if he or she passed the PAT and survived the interviews. Adopting the analysis proposed by the City would

18

not permit comparison of the success rates of the males versus the females in the pool of qualified applicants, because the analysis would not be implemented until a stage where most of the qualified female applicants had been eliminated. The comparison the City advocates is between the success rate of a very small group of hyper-qualified female applicants and the success rate of a group of hyper-qualified male applicants.

In *Berkman v. City of New York*, 536 F. Supp. 177 (E.D.N.Y. 1982), aff'd, 705 F.2d 584 (2d Cir. 1983) the city argued that the women who were eliminated by the physical test did not, in effect, belong in the pool of qualified applicants for statistical analysis because they had been shown to be not "strong enough to do the work required by the job." *Id.*, 536 F. Supp. 177, at 206. The court rejected this contention, saying that it "seeks to re-define the issues and reverse the burden of proof established by the Supreme Court for Title VII cases." (*Id.*) The Supreme Court's preference has been to conduct the statistical analysis at step one of the disparate-impact paradigm from a broad base. *See, e.g.*, *E.C. Dothard v. Rawlinson*, 433

U.S. 321, 330 (1977) (finding total population, rather than pool of qualified applicants, to be relevant sample because "[t]he application process might itself not adequately reflect the actual potential applicant pool, since otherwise qualified people might be discouraged from applying because of a self-recognized inability to meet the very standards challenged as being discriminatory")

> c. Focusing on individual components of a test will inevitably make statistical analysis difficult or impossible.

The reason there were only seven women left to take the pike pole part of the test, the last part, was that of the twenty-eight women who had appeared to take the test, three had quit during the test and nineteen had been disqualified for failing to meet the minimum performance standard on one of the earlier components of the test. (Dkt. #53, ¶ 53, Table: Twenty women were disqualified, in all, including Ms. Erdman, so if she was the only one disqualified on the pike pole component, the other nineteen had to have been disqualified on earlier components.) Thus, in situations like this one, where substandard performance can result in the elimination of

candidates before they even complete the entire test, and the
component that eliminated the plaintiff is one of the last components
in the test, she will inevitably be hamstrung by a smaller sample size
of female participants at the relevant stage, making statistical
analysis less useful to her. Moreover, the component approach
would place the women who were disqualified by the earliest
events, when many women were, in a stronger position legally than
the women who held on until they were the last woman standing.
This would be one more injustice visited upon the women
disqualified in the later events.

> d. Time limits and the weighted belt tie the
> components of the test together.

There are also logical problems with conducting disparate
impact analysis only as to the last part of a multi-part test, where
performance on the later parts of the test is inevitably linked to
performance on the earlier parts by the rules of the test as a whole.
Each component of the test was timed, and the recovery periods
allowed between components were limited and timed.  Candidates

21

were not expected, during these rest periods, to recover completely from the fatigue caused by prior components. The requirement of wearing a forty-pound weighted vest during the entire test not only made each component of the test harder, but inevitably increased the carryover fatigue from prior components to the next one.

e. Unitary scoring makes for a unitary test.

To pass the PAT, an applicant has to obtain a passing score on five of the seven components and be disqualified by none of them. The test is a physically demanding, exhausting affair, with tasks of specified duration requiring intense muscular effort, separated by short rest periods of specified duration. It is apparent that many applicants will find it necessary to exert their subjectively maximum effort, at least at some points, and, probably, in most tasks. In the CPAT revalidation study in Austin, some "subjects were unable to complete the test due to fatigue." (Exhibit 6, p. 4 of 42.) That is a factor affecting success or failure on the test as a whole – candidates who can breeze through the earlier events without accumulating

disabling fatigue will be better able to perform in the later events

and more likely to achieve passing scores on the test as a whole.

### 6. The City's proposed level of analysis is unworkable at the third stage.

If a plaintiff shows a statistically significant disparate impact

and the defendant proves it is "job-related for the position in

question and consistent with business necessity," (A-1), the

plaintiff can still prevail by showing that "the employer refuses to

adopt an alternative hiring practice resulting in less disparate

impact and serving the employer's legitimate needs." (A-11.)

If the unit of analysis is the test as a whole, it will be

possible to look at alternative tests to determine whether any of

them serve the purpose of the challenged test and have less of an

adverse impact on women. Data regarding the passage rates by

sex will commonly be available for alternative tests. (A-37-38.)

But if the unit of analysis is an individual task in a physical test,

or *an individual question* in a written test, it may well not be

possible to know the success rates by sex of possible alternatives,

simply because nobody keeps track of them.

### 7. The City's proposed level of analysis will create ludicrous scenarios in the cases involving tests with dozens of questions.

Actual IQ tests, like the Stanford-Binet Intelligence Scales or

the Wechsler Adult Intelligence Scale (WAIS-IV), contain several

hundred questions and take, in the case of the WAIS-IV, between 60

and 90 minutes to complete.[4]  It is sobering to contemplate the path

disparate impact jurisprudence would have taken, no doubt leading

to its early demise, if instead of looking at whether the Wonderlic

Personnel Test, which purported to measure general intelligence,

had a significant adverse impact on black applicants because they

had "long received inferior education in segregated schools," *Griggs*

*v. Duke Power Co*., 401 U.S. 424, 428 (1971), the Court had required

that racial disparities in passage rates be analyzed on each

individual question of that test.  In all probability, the necessary data

---

[4] https://www.themarysue.com/iq-tests-how-do-they-work/, last accessed June 2, 2023.

would not have been available or the analysis would have been impossible.[5]

One thing is sure: an apparently trivial difference in passage rates on each question – a difference small enough that it may not be statistically significant and therefore not subject to challenge -- expands as the number of questions increases.  If, say, a black applicant at the Duke Power Company had .96 of the probability of a white applicant of succeeding on each question of the Wonderlic test, by the time they have completed ten questions, the black applicant has a significant disadvantage and by the time they have completed 30 or 50, the difference can be great.[6]  On any given question, almost all of the blacks will do almost as well as the

_____

[5] Even the Wonderlic Personnel Quicktest of cognitive ability requires answering 30 questions in 8 minutes.
https://en.wikipedia.org/wiki/Wonderlic_test, last accessed June 2, 2023.
[6] In flipping a coin, if one is trying for heads, the probability of getting heads on one flip is .5. The probability of getting heads on two successive flips is .5 x .5 = .25: one chance in four.  If a black applicant has .96 the probability of doing as well as a white applicant on each question, his or her probability of doing as well as a white applicant on two successive questions is .96 x .96 = .92. The incremental disadvantage marches on, question after question. By ten questions, the probability of equal performance is .64.

whites, but as the small disparity associated with each question adds up over many questions, it becomes truly significant. To insist on conducting a disparate impact analysis at the level of individual questions is to ignore the cumulative effect of each question's small disparity in passage rates on members of a group disadvantaged by the test as a whole.

## II.    The City Fails to Rebut Ms. Erdman's Third-Stage Arguments.

Ms. Erdman made several points in her principal brief that the City does not oppose. For example, the City does not oppose Ms. Erdman's contention that she will be entitled to prospective injunctive relief if she establishes liability for disparate impact, even if the Court does not disturb the district court's decision on summary judgment – that she is not entitled to make-whole relief for not getting the job.  (Erdman Brief, Ct. App. Dkt. # 14, at 39.) The City does not oppose Ms. Erdman's contention that the comparison between the PAT and the CPAT must assess the ability of the

26

respective tests to identify those candidates with the *minimum physical qualifications* to do the job, not their ability to identify those candidates with elite physical ability. (Erdman Brief, Ct. App. Dkt. # 14, at 70-71.)

## A. The District Court Did Not Make Extensive Factual Findings.

The City says that, "the district court made extensive factual findings regarding the 'cost[s] or other burdens' associated with adopting the CPAT." (City Brief at 32-33 citing A-37.) This is simply not true.  The district court's entire justification for its holding that the Plaintiff had failed to carry her third-stage burden was set forth in a single paragraph, quoted in full in Erdman's principal brief, (Erdman Brief, Ct. App. Dkt. # 14, at 67) and in the City's brief (City Brief at 33 citing A-40.)

## 1. The Transferability Study to Adopt the CPAT would be Simple and Cheap.

One of those "extensive factual findings" was that one of the costs or other burdens associated with adopting the CPAT would be

27

"the need to perform a transferability study" (A-40), but the City

introduced no evidence and the district court made no finding as to

the cost of such a study. The only evidence the City cites in its brief

is a couple of lines of testimony from former Fire Chief Amesqua, in

which she used the word "exorbitant." (City Brief at 34 citing Tr.

Dkt. #67, 231:21-23.) But this testimony was not even about the cost

of a transferability study – it was about the cost of providing the

coaching and practice sessions the EEOC negotiated into the CPAT

in 2006.[7]

---

[7]     The testimony was:

> Q     Do you know whether -- do you know anything about the 2006 conciliation agreement between the EEOC and the CPAT people at the IAFF?
> A     No interest in it. No, sir, I don't.
> Q     Do you think that there might be value to -- well, one of the things that required was there be orientation sessions for the test so that the test takers could become familiar with the test before actually taking the timed test to pass or fail. Do you think those orientation sessions might be of value?
> A     Anytime you can practice, it's a value.
> Q     And one of the things the EEOC required in its conciliation agreement was that during those orientation sessions there be qualified personnel available to coach applicants to teach them the techniques that would be successful for performing the tasks on the CPAT. Do you

The real, required, transferability study, just involves
comparing the duties and the equipment of a given department
against those of the original ten departments that participated in
developing the CPAT (Erdman Brief, Ct. App. Dkt. # 14, at 67-68),
and the City has never even claimed that this would be a difficult or
expensive proposition. In fact, the City did a very similar
comparison of duties in 2013-2014. (Dkt. #53, ¶ 21.)

---

think that that kind of mentoring could be of value while
practicing?

A       That would be extremely valued. However, if you've
got 800 candidates that you're running through the process,
you've got to figure out how to pay people to be able to do
that.

THE COURT: So you're saying for the volume of
applicants --

THE WITNESS: Yes, sir.

THE COURT: -- the cost wouldn't --

THE WITNESS: It's exorbitant. I have to pay overtime, time
and a half, to have people come and actually do that for
those candidates.

Tr. Dkt. #67, 230:23 – 231:23.)

**2.  There is No Evidence that Candidates who Passed the CPAT would Wash Out of the Academy at a Higher Rate than Candidates who Passed the PAT.**

Next, the City points out that the district court felt that "candidates who succeed in the PAT have historically stood a good chance of not washing out of the academy later in the process at great expense to the City." (City Brief at 34.)  But the City presented no evidence that candidates who passed the CPAT would wash out at a higher rate than those who passed the PAT, and the district court made no finding that candidates who passed the CPAT would wash out at a higher or lower rate than candidates who passed the PAT.[8]  The only *evidence* on this point came from Professor Weltman, who testified that it would be unlikely that more females would wash out of the academy after passing the CPAT than after passing the Madison test. (Tr., dkt. # 67, 96:14-23.)

---

[8] Even if there were any evidence to support this speculative proposition, relying upon it would come perilously close to throwing out the minimum-standards criterion for assessing selection devices.

**3. The Relatively High Percentage of Female Firefighters in the Madison Department does not Help to Prove that the PAT is Better than the CPAT.**

The City next contends that the

> PAT was resulting in a gender-diverse workforce as compared to departments which were using the CPAT. (Tr. Dkt. #67, 224:7-14.) The only logical conclusion to be drawn from that finding is that departments using the CPAT were either (1) experiencing an adverse impact similar to Madison; or (2) were washing applicants out of training at a higher and more expensive rate. The district court correctly found that the Department's high percentage of women firefighters was persuasive evidence of the PAT's efficacy and legality.

(City Brief at 35.)

First, the cited testimony from former Chief Amesqua does not say anything about "departments which were using the CPAT." The question asked for a comparison, not with "departments which were using the CPAT" but with "nontraditional jobs." The cited testimony at least narrows the field to "fire departments across the nation." It says:

31

Q     And did you maintain a percentage of female firefighters in the department consistent with a high end in terms of nontraditional jobs?

A     If you look at fire departments across the nation, they are lucky if they get 5 percent women in their department. I had 14 percent and 14 percent, and I was losing them on one end, bringing them in on the other. Yes, I was very happy with the process.

(Tr. Dkt. #67, 224:7-14.)

The City does not respond to the point made in Erdman's principal brief that factors *other than* survival rates through respective departments' physical tests probably contribute to causing higher or lower percentage representations of female firefighters. Fire departments probably vary in the numbers of females who apply for firefighter jobs in the first place and in in the extent to which females who survive the relatively objective physical tests also survive the more subjective elements of the selection process. These subjective phases of selection processes inevitably have as much impact on the female percentages of new academy classes as the objective phases. And fire departments certainly cannot be assumed to be equal in the extent to which women who

survive the entire selection process and are hired feel that they are treated equally to men, and with respect, on the job, yet factors like this doubtless affect individuals' decisions as to how long to stay on the job, and thus affect female representation percentages. If women in a backward department last, on average, seven years, and leave because they feel discriminated against by superiors and peers, while men last twenty years, those numbers alone will depress the percentages of females on those departments even if the selection process is fairer than fair.

The record shows vaguely (A-38) that lots of Departments use the CPAT, but it is silent as to whether a majority do. So there is no way to know how closely a comparison between the percentage of female firefighters in the Madison department and the *average* percentage in other departments across the nation resembles a comparison between a PAT department and a group of CPAT departments. It could be that most of the departments dragging down the national percentage *do not* use the CPAT, but use some physical test even more discriminatory than Madison's.

### 4. The PAT's Replication of Madison Firefighters' Unique Duties Hurts the City's Case.

The City wants to profit from its test's replication of duties that can be learned in training or on the job and deny the fact of replication at the same time.  It argues that "The district court next concluded that adopting the CPAT would be burdensome and costly for the City because specific aspects of the PAT had been developed and tailored for the Department's specific needs."  (City Brief at 35.) But the City also concedes, "Indeed, the Uniform Guidelines caution against using selections procedures which can be learned on the job." (City Brief at 37, citing 29 C.F.R. §§ 1607.5(F) and 1607.14(C)(1).)

The City contends that "the purpose of the PAT is not to measure skills which can be learned on the job. Rather, it is to measure the abilities which candidates must have to be successful in the field."  (City Brief at 37.) But the examples the City provides, like "the rescue drag component in the PAT more accurately reflected a residential fire scene in Madison because it zig zags as opposed to the CPAT which is a straight drag," or swinging a sledgehammer

vertically instead of horizontally, (City Brief at 36), seem to be things that 1) are not all that unique to Madison and 2) could be learned in training or on the job.

    And the testimony the City cites in support of its position contributes zero support for the notion that the unique aspects of the PAT are measuring skills that cannot be learned on the job. The City says, "Dr. Jacobs designed the PAT to avoid measuring tasks that can be impacted by training or an orientation period." (Tr. Dkt. #68, 11:2-7, 65:24-66:6.)" (City Brief at 37.) But the cited testimony is just that conclusory and it provides no support for the proposition that any particular skill measured by the PAT cannot be learned in training or on the job, and no reason to suspect that the cited witness, Dr. Jacobs, even knows what skills can be learned in training or on the job.[9]

---

[9] Tr. Dkt. #68, 11:2-7:

> Our approach has always been the other one, which is to say to the degree possible, let's simulate as much of the job as we can, still not requiring specific things that these candidates might be trained on when they go to an academy or get the

## CONCLUSION

This Court should hold that the district court's conclusion that

the CPAT is not substantially equally as valid as the Madison

Physical Abilities Test is clearly erroneous because it reflected a

failure to apply crucial legal principles, reverse it, and remand for

the entry of judgment for the Plaintiff.  If it does this, the Court

should also reverse the district court's decision granting summary

judgment to the City on the issue of whether, if she had passed a

lawful physical test, Ms. Erdman would more probably than not

---

job, but at least let's get them doing the kinds of things that
they will do at work.

Tr. Dkt. #68, 65:24-66:6:

Q.     Then the bottom of the next paragraph, the guidelines
technical standards say, quote, "Content validity is also not
an appropriate strategy when the selection procedure
involves knowledges, skills, or abilities which an employee
will be expected to learn on the job," end quote.

You're trying to keep those sorts of things out of your
test, I take it?

A.     Correct.

have been offered a position as a Madison firefighter, and remand

the case for a trial on this issue.

Dated this Friday, June 02, 2023.

Respectfully submitted,

Catherine Erdman,

Plaintiff–Appellant,

By

THE JEFF SCOTT OLSON LAW FIRM, S.C.
    Jeff Scott Olson
    (*Counsel of Record*)
    State Bar No. 1016284
    131 W. Wilson Street, Suite 1200
    Waunakee, WI 53597-2502
    Phone:      608 283 6001
    Facsimile:   608 283 0945
    e-mail:      jsolson@scofflaw.com

/s/Jeff Scott Olson

_____

JEFF SCOTT OLSON
Attorneys for Plaintiff-Appellant

37

**Rule 32(a)(7) CERTIFICATION**

This brief complies with the type-volume limitation of Rule 32(a)(7) inasmuch as it does not exceed 7,000 words, from the Jurisdictional Statement through the Conclusion.  The length of this brief is 6,778 words.

Dated this Friday, June 02, 2023.

/s/Jeff Scott Olson

_____

Jeff Scott Olson


**FORMER CIRCUIT RULE 31(e) CERTIFICATE**

The undersigned counsel of record hereby certifies as follows:

1.      This brief has been reproduced digitally in non-scanned pdf format and uploaded to the Court's website.

/s/Jeff Scott Olson

_____

Jeff Scott Olson

## **CERTIFICATE OF SERVICE**

I hereby certify that on Friday, June 02, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/Jeff Scott Olson

_____

Jeff Scott Olson